Carr, J.
A question was made in the argument, whether the will of the testator Walker was an effectual instrument of emancipation of his slaves; but that question is not open for inquiry, unless the decree of June 1809, by which they were directed to be manumitted, can be examined by the court. It certainly cannot: it was a final decree, from which no appeal was ever taken, and none can now be taken: and if the decree were examinable as to the question of emancipation, the appellants have not raised it in their bill recently exhibited; they there ask only the surplus of the profits. On the other hand, it was contended, that the right of the freedmen to this surplus, as well as their right to freedom, was adjudicated by the decree of 1809; but neither is there any foundation for this position. The question comes before us, on the appeal from the last decree; and we are now to decide to whom the surplus of profits belongs—shall the freedmen have it? shall the executor retain it ? or shall we decree it to the testator’s next of kin?
It was strongly contended for the freedmen, that this fund having been raised from their labours, after they were entitled to their freedom, ought of right to go to them. There is much in this argument, which addresses itself to our sense of justice, and to our feelings; but unfortunately for them, the point has been irrevocably settled against them. Suits of this kind have been very frequent in Virginia, for more than a century past. There have been numerous cases of recovery of freedom by persons illegally held in bondage; and in many of them, the violation of freedom has been gross and palpable, and the public feeling strongly on their side; yet, in not one single case, have damages for the detention been given. In Pleasants v. Pleasants, the chan *177 cellor had allowed profits, contrary to the established rule ; but this court reversed his decree in that particular; and the rule which denies profits in such cases, has been invariably followed ever since. Hard as the case may seem upon the freedmen, I for one, can never think, at this day, of breaking through this settled course and policy of the country.
Let us next inquire, whether the executor shall retain this surplus, as a residuum, undisposed of. With respect to the influence of our statute of distributions on this question, my impression is, that the suggestion of president Pendleton, in Shelton v. Shelton, is correct. I believe too, it has from that time been taken as the law: I see that judge Roane, in delivering the opinion of the court in Hendren v. Colgin, 4 Munf. 235. takes it as a settled point. Yet, as it has been questioned by a brother judge in Wernick v. M’Murdo, as the point is very important, and there is now a bare court, and as the question before us may (as I think) without the aid of the statute, be easily settled by the long established doctrines of the law, I have thought it best to give no opinion on the construction of the statute.
By the common law, the whole personal estate devolved on the executor; and if after payment of debts, legacies, and other charges, a surplus remained, it vested in him beneficially. But this rule was considered to operate hardly upon the next of kin $ and, therefore, wherever it appeared, on the face of the will, either expressly or by sufficient implication, that the testator meant to confer on the executor, merely the office, and not the beneficial interest, equity interposed, and converted him into a trustee for the next of kin. President Pendleton, in Shelton v. Shelton, has shewn, with his usual ability, how, in the progress of this doctrine, variant and irreconcileable decisions took place, as different chancellors favored the legal, or the equitable, rule. Thus lord Thurlow laid it down, that the rule that the executor shall take the residue, must prevail, unless there be an irresistible inference to the contrary; while lord Macclesfield *178 had held, that the next of kin have the apparent right, and there-must be a devise of the surplus to the executors, either express ly, or by unavoidable implication, to exclude the next of kin: “ An executor, he said, from his name, is but a trustee, he being to execute the testator’s will, and therefore called an executor.” I confess, I think the reason and justice of the case wholly with lord Macclesfield; and though he has been thought to carry the doctrine a little too far, I think he is in the main supported by the cases, especially the later ones. Thus, if there be a residuary clause, though the name of the legatee be left blank, and thus rendered ineffectual; or, if there be a residuary legatee, and he die in the life of the testator; or, if there be a particular legacy given to the executor; in all these cases, he is held to be a trustee for the residue. See the cases collected by Cox, in a note on Farrington v. Knightly, 1 P. Wms. 550. and Nourse v. Finch, 1 Ves. jun. 344. 2 Id. 78. It has also been decided, in numerous cases, that if one of several executors is made a trustee, for any particular purpose connected with his office, all shall be held trustees of the residue for the next of kin. In Urquhart v. King, 7 Ves. 225. a testatrix commenced her will by saying she intended to dispose of part of her personal estate : she then gave several legacies to relations of her deceased husband, residing in the U. States, and, after very particular directions as to those legacies &c. she concluded thus—“ I constitute and appoint the honorable Rufus King, minister plenipotentiary from the U. States, or such other person who at the time of my death shall be minister plenipotentiary from the U. States, to this kingdom, and Francis Gregor &c. executors of this my will.” She then by a codicil gave other legacies, specific and pecuniary, and made no disposition of the residue. The executors claimed it, beneficially, and the next of kin filed the bill against them: the only question was, whether the executors were trustees of the residue for the next of kin ? Sir W. Grant said, “ It is true, at law, the appointment of an executor is a gift of every thing not otherwise disposed *179 of. But, m equity, it is always a question of intention, whe- , . . , , , „ . „ , . ther he is entitled beneficially, or as a trustee ; and the question always arises upon the sufficiency of the evidence, by ..... : , ,, .. , . which the intention is made out. tie proceeds to state it as settled law, that the leaving a legacy to an executor, raises a presumption, which, unless he can rebut it by evidence, makes him a trustee; and adds—“In this case, the circumstances much more strongly indicate the real intention that the executors should not take beneficially, than a legacy would have done.” He then points out those circumstances; among others, that the appointment of Mr. King was not in his individual capacity as a friend, but as minister—or such other person who at her death should be minister; and concludes, “It is evident, therefore, she meant to confer an office only; and the intention is much more clear than it would be from the single circumstance of a trifling legacy to each:” and he decreed for the next of kin.
Let us look now at the will before us, and see whether it is not most clear, that the testator intended to confer on his executors an office merely; to constitute them trustees for the purposes of his will, and more especially, for the emancipation of his slaves. His property consisted of two parcels of land, stocks, furniture and slaves; and, after giving his lands, stocks and furniture to his wife, son and daughter, follows the clause desiring that after his debts are paid, his slaves may be emancipated according to law: Adding, “ I desire this may be done by Benjamin Jones and my brother David, whom I appoint executors” &c. Can any one fail to perceive, that this testator meant to dispose of, and in fact disposed of, every atom of property he had in the world; thereby evincing, as clearly as any residuary clause could do, that he meant to leave nothing to be taken by his executors ? Is it not most apparent, that, with respect to the emancipation of his slaves, and every measure necessary to effectuate that end, he constituted them trustees, without dreaming that they were to draw one cent of profit from *180 the-execution of the trust? Could he have used any words of inhibition, however strong, that would have made this more clear? Suppose he had left these two executors 100 . dollars apiece; would that have made it more manifest than it is now, that he did not intend to have his slaves hired out beyond the period when a sufficient sum was raised to pay his debts, for the purpose of creating a fund to go into the pockets of his executors? Assuredly, not. If it be said he had as little intention of creating a fund in this way for his next of kin, I agree to it fully; but the same consequence does not follow to them as to the executors. Here is the money; it is part of his estate undisposed of, raised, by the error of the executors; to them we cannot give it: but it is different with the next of kin; for (as lord Hardwicke says in Southcot v. Watson, 3 Atk. 231.) they “ take by a kind of succession ab intestato, without the assistance of this court; and it is the law throws it upon them.”
Cabell, J. I am of opinion that the decree of June 1809, declaring the pauper plaintiffs free, was clearly final, and that, not having been appealed from, it is no longer examinable. If it were otherwise, and it were now regularly before us, I should think that it ought to be affirmed. But, I do not think that the subject of the surplus profits of the freedmen, accrued before the date of the decree, was, in any manner, disposed of by it. It may, probably, be inferred, that the chancellor entertained an opinion that the freedmen were entitled to this surplus; but he did not give to that opinion the form or character of a judicial decision. The right to them, therefore, is now properly before us, on the present appeal.
I consider it the settled law of this country, that a person held in slavery, no matter how long and unjustly, cannot recover damages in the form of profits, or otherwise, for his illegal detention in slavery. This being the settled law, I deem it unnecessary to inquire into its policy or abstract justice. I am not disposed to disturb it. The decree is erroneous in this particular.
*181 Nor do I think, that the executors are entitled to this surplus of profits. They cannot claim to hold it merely on the ground of having received it, provided any other person can shew a better title to it. While they held the slaves of Walker's estate, they held them as fiduciaries, for the benefit of the estate; and their reception of the profits followed the character of their ownership of the slaves themselves, and, consequently, was fiduciary also.
But it was contended, that the executors will be entitled to the hires, as a part of the surplus of the estate, after the payment of debts and legacies. And this brings on the question, whether executors, in this country, are entitled to such surplus, in any ease whatever, since the statute of distributions of 1785. Before the passing of that statute, the law as to the surplus of an estate, after the payment of debts and legacies, was certainly the same here, as in England. President Pendleton, in Shelton v. Shelton, speaking of the principles which should govern the decisions on this subject, said—“There are'two, which seem the ground work, and are fixed : 1st, a legal one—That the naming of an executor, is a disposition to him of all the personal estate; and after payment of debts and legacies, the surplus belongs to him as a recompense for his labour and trouble. And if the spiritual court at this day, are about to compel the executors to distribute the surplus to the next of kin, the king's bench will grant a prohibition. 2ndly, A contending principle of equity, that where there is fraud in obtaining the executor-ship, or where it manifestly appears to have been the testator’s intention, that the executor should not have the surplus, a court of equity will consider the executor as a trustee only as to the surplus for the next of kin.” But, although these principles were fixed, much difficulty had been experienced in applying them to particular cases. What is to be regarded as proof of the testator’s intention that the executor should not have the surplus ? This question perplexed the judges in almost every case. At first, they confined themselves to a few circumstances only, as affording this proof. But, after- *182 wards, “ they branched (as president Pendleton expressed it) into other considerations, which produced determinations, not to be reconciled, in principle, to each other, and which must be resolved into the different inclinations of the chancellors to favor, some the legal, others the equitable rule; and to make the favored rule apply to the case before them.” And, I believe, it may be confidently affirmed, that no subject in the whole law, has given rise to more contradictory decisions, and that, consequently, none has been more fruitful of litigation. It was in this state of things, that our legislature passed the statute of 1785. Did it mean only to provide thereby, for those very few and rarely occurring cases of partial intestacy, mentioned by judge Green, in Wernick v. M’Murdo? or, to put an end to the perpetual controversies between executors and the next of kin, as to the surplus after the payment of debts and legacies ? It seems to me absolutely certain, that the legislature, in using the terms, “ intestate as to his goods and chattels, or any part thereof,” did not mean to apply them to a case of mere technical intestacy; to a case where a man, although he actually leave a will disposing of his whole estate, is, nevertheless, held to be intestate in law, because he has appointed no executor, or because the executor appointed, has refused to act. If the statute of 1785, were to apply to such a case, the consequence would be, that a man’s estate would be distributed among his next of kin, in opposition to his declared and written will to the contrary, if he failed to appoint an executor, or the executor named died before him, or refused to qualify. Such a consequence was never contemplated, and would not be tolerated by the legislature. The statute cqn be applied only to cases, where a person has failed to declare by his will, expressly or by necessary implication, his intentions as to the disposition of his property; to cases, where he has failed to make an actual bequest. But, then, it extends to every such failure, whether that failure be partial or total; for the language of the statute is, when a person dies intestate as to his goods and chattels, or any part *183 thereof. When we advert to the numerous and contradictory decisions of the courts, and the evils consequent on such an unsettled state of the law, prior to the statute of 1785, and to its peculiar phraseology, (the words, or any part thereof, having then, for the first time, been introduced into our statute of distributions) I am constrained to believe, that the legislature had in view, this very case of the surplus after payment of debts and legacies, and intended to put an end, forever, to all controversies concerning it, by giving it, in all cases, to the next of kin. This was the opinion of this court (extrajudicially expressed, it is admitted) in Shelton v. Shelton, and of judge Coalter, in Wernick v. M’Murdo; and, indeed, I have never heard a different opinion expressed, by any person whatever, except by judge Green, in the last mentioned case.
Tuckeb, P. I consider the decree of June 1809 as concluding the right of the pauper plaintiffs to freedom. If that decree is erroneous (which 1 am not disposed to think it is) this court cannot, at this day, correct its errors, or even question its accuracy. It was the decision of a court of competent jurisdiction upon the matter in litigation, from which there was no appeal taken, and which cannot now be reversed: the matter has passed completely in rem adjudicatam. It is not only binding, but we must take it to be a correct decision, in proceeding to adjust the ulteriour pretensions of the parties growing out of it. I take it, therefore, as a postulate, that the freedmen, in this case, were justly entitled to their freedom in 1809, under the will of Walker; and that it was properly decreed to them by the court of chancery.
But though, by that decree, the right to freedom was placed beyond question, the right to the profits was not so definitively settled, as seems to have been supposed by counsel. That the opinion of the chancellor may have been at that time made up, is very possible. But that opinion can have no influence, unless it has passed into the form of a *184 decree determining the rights of the parties. From such a mere opinion, there could have been no appeal for the purpose of correcting its errors; and it would be strange, that the party should be bound by it, without having power to have it corrected, if erroneous. In interlocutory decrees, indeed, where the principles of a case are settled by the court, and ulteriour measures resting upon those principles are directed, an appeal will lie, because it may be necessary to arrest an expensive or dilatory course of proceeding, by striking at the principles of the decree out of which it is to grow. But here, the chancellor settled nothing as to this point. He merely reserved to the plaintiffs, liberty to resort to the court, for distribution of any surplus remaining after the debts should be paid, or for any other arrangement in relation to such surplus. Surely, this is any thing but a decree for the surplus. Whether the whole profits might not be absorbed by debts, did not appear, and therefore, whether Walker's freedmen would ever get any thing, or his distributees lose any thing, it was impossible to say. Had Robinson, the executor, appealed from that order, and the whole amount been absorbed by debts, so as to have left no subject of controversy, the absurdity of such an appeal would have been manifested. Therefore, I think, we must consider the reservation, not as settling the rights of the parties definitively, but as merely providing for the mode of bringing them before the court for final adjudication, when the affairs of the estate should have been completely wound up.
Considering the question of the profits as being open to inquiry, I think there is little difficulty in denying the correctness of the decree which has given them to the freedmen. No instance has ever occurred, I believe, in the history of our adjudications in these anomalous cases, in which profits or damages have been allowed to the claimants, as a compensation for detaining them in slavery. In Pleasants v. Pleasants, the demand was refused; and for thirty years, this decision seems to have been so far acquiesced in, that *185 no such pretence is believed to have been since set up. It is too late, now, to make a precedent; and if it were not, there are many grave considerations which ought to be weighed before we should undertake to do so. It is, perhaps, difficult to say whence the opinion first arose, though it very probably originated in the nature of the suit or demand. Though its form was that of an action of assault and battery and false imprisonment, yet, in substance, it was always considered but as a fictitious action moulded by the courts for the purpose of trying the mere question of freedom. “ Actions like the present” (said president Pendleton in Coleman v. Dick, 1 Wash. 233.) “ are merely fictitious, and are very properly in this respect (as to number of parties joining) likened to actions of ejectment.” They are, in effect, to try the right, not to try the injury ; as the writ of right, at common law, settled the mere right, but never gave damages. The issue made up between the parties is upon the right to freedom only, not upon the quantum damnificatus, and still less upon any idea of contract, express or implied. There is no room for such an implication where one party is held by another in slavery. There is little reason for it, when we consider that the slave, in his birth and his infancy, has been a burden, and that if the master could have foreseen his emancipation and his demand for profits, he might have been altogether averse from incurring such a charge. Moreover, having held and enjoyed the slave as his own, and acted entirely on that supposition ; having spent the profits made by him during a long course of years, in the confidence they were his own; there is much reason for the application of the principles laid down by the court in Skyring v. Greenwood, 4 Barn. & Cres. 272. 10 Eng. C. L. R. 335. In that case, the paymaster of a corps had credited an officer with increased pay, which he was informed by the board of ordinance would not be allowed, but which information he did not communicate to the officer. The court refused to permit the paymaster to rectify the credit, by setting it off against *186 the officer’s demand : chief justice Abbott said,—“ they suffered him to suppose, that he was entitled to the increased allowances. It is of great importance to any man, not to be led to suppose his income is greater than it really is. Every prudent man accommodates his mode of living to what he supposes to be his income; it therefore works a great prejudice to any man, if after having credit given to him in account for certain sums, he may be called upon to pay .them back.” The principle here avowed lies at the root of many of the doctrines of the law. Upon this ground, in part, no damages were given in droiturel actions; upon this ground, even now, rents and profits can only be recovered for five years anteriour to the demand. Why ? Not because they are presumed to have been paid, but because there ought to be some reasonable limit to a reclamation which might beggar a party, who, in good faith, had only spent and enjoyed what he believed to be his own. These principles apply a fortiori to the demand of a pauper who has recovered his freedom. Held by his master as his own property, brought up at his expense in infancy, sustained at his charges in sickness and in health; treated, perhaps, with an indulgence, which would not have been extended to one whom he knew to be a hireling; it would be ruinous, indeed, to many a master if these unexpected demands for profits were permitted or countenanced by the courts. While, therefore, it cannot be denied to be a hardship on the person illegally held in bondage, it is not improbable that the difficulty of doing complete justice, together with the policy of protecting the master from a demand he could not have expected, lay at the foundation of the practice now firmly established. From that practice, I shall not ^deviate, nor admit a single exception. The legislature by the statute concerning pauper suits, 1 Rev’. Code, ch. 124. § 4. has prescribed the course to be pursue'd in suits for freedom. The statute gives the courts authority to permit the petitioner to sue in forma pauperis for the recovery of his freedom; but it provides nothing a.s to damages or profits, *187 though the courts had uniformly denied them. I argue from hence, a legislative assent to the principles established by the general practice of the country; and until a new law shall otherwise provide, I hold myself bound to adhere to that practice. I do not think it necessary, in addition to what I have said, to rely at all upon the proposition, that as no contract for profits can be implied, as they could only be recovered as damages for unlawful detention, there could be no such demand in equity. Yet this would of itself, perhaps, be a sufficient answer to such a demand in that court. Nor is it necessary to dilate on the particular character of the will, in this case, which does not direct the slaves to be hired out, and that when the debts should be paid out of their profits, they should be emancipated. It merely fixes upon the time when the affairs of the estate should be settled up and the debts paid, as the time for their emancipation. This has been settled by the former decree in the year 1809, at which time their title to freedom was consummate. The profits were, accordingly, received for the estate, and cannot be paid over to the freedmen, since they were not free, when the profits accrued. They derived their freedom, indeed, from the will; but it was not perfected until the execution of the power under the will by the executor.
The question as between the distributees and the executors of Walker next presents itself. Without again adverting to the language of the will, in this particular case, as decisive of the point that all the profits of these slaves until their actual emancipation, belonged to the estate, I will remark, that, as the executors came to the reception of these profits in their fiduciary character, they can have no title to retain them. The argument indeed, was most ingeniously and imposingly put—that the distributees had no pretence of right to the profits of these persons, who ought to have been in the enjoyment of their freedom ; that, as profits are not recoverable by the plaintiffs in a pauper suit for freedom, the person who may chance to be the holder, will be entitled *188 to the benefit, and that Robinson, the executor, being the holder, and a wrongdoer, he was entitled to retain the profits remaining in his hands, because there is no other person who has a right to demand them. The defect of this argument consists, I think, in the omission to consider Robinson as holder, not for himself, but for the estate. Whatever incidental advantage might be derived from the possession of these people while held as slaves, belonged to the estate of his testator, since he had that possession only in a fiduciary character as representing that estate. An agent or overseer could not claim to retain the profits of a slave who recovered his freedom, though he may have actually received them, since his possession and his receipt of the profits, were not in his own right, but in right of another.
With respect to the question of the right of the executor to the residuum, I have always considered president Pendleton’s suggestion in Shelton v. Shelton, as perfectly correct. For more than forty years, it has been deemed the law in Virginia; and thousands of wills have been probably drawn with a conviction, that it was no longer necessary to give the executor a legacy, or in any other manner to provide for his exclusion from a right to the residuum. A law of property has thus grown up, which I think it would be unwise to disturb, even if there were sound reasons for questioning the interpretation given to the statute by president Pendleton, and acquiesced in ever since by the legislature and the courts of justice.
Upon the whole, I am of opinion that Walker’s distributees are entitled to the fund which has arisen from the profits of the slaves, so far as the same has been unexhausted by debts, and that the decree must be reversed.
Decree reversed.